1

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                         SAVANNAH DIVISION

 3   JESSICA GOSSE,                )
                                   )
 4        Plaintiff,               )
                                   )
 5      vs.                        )     CASE NO. 4:24-CV-278
                                   )
 6   WELLSTAR MCG HEALTH, et al.,)
                                   )
 7        Defendant.               )
     ---------------------------

 8

 9

10

11

12

13               TRANSCRIPT OF SHOW CAUSE HEARING
            BEFORE THE HONORABLE CHRISTOPHER L. RAY
14                 United States Courthouse
                    8 Southern Oaks Court
15                     Savannah, GA
                   September 8, 2025
16

17

18

19

20   COURT REPORTER:   Kelly A. McKee, CCR, RMR, CCP, RDR
                        United States Court Reporter
21                      P.O. Box 8286
                        Savannah, GA  31412
22                      912-650-4065

23

24     (Proceedings recorded by electronic recording, transcript
     subsequently produced by mechanical stenography and
25   computer-aided transcription.)
```

1                          APPEARANCES OF COUNSEL

2    FOR THE PLAINTIFF:

3         (Not present)

4    FOR THE DEFENDANT:

5         (Not present)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

# P R O C E E D I N G S

**(Call to order at 12:30 p.m.)**

1

2

3     THE COURT:  Good afternoon, everyone.

4     Ms. Davenport, if you would, please call the case.

5     THE CLERK:  4:24-CV-278, *Jessica Gosse vs. Augusta*

6  *University, et al.*

7     THE COURT:  All right.  Good afternoon.  We are here

8  today on a hearing related to an order to show cause, which was

9  entered on July the 11th of 2025 at Docket Entry Number 15.  It

10  directed attorneys Mr. Joseph Lento and Mr. Kyle Adams to show

11  cause as to why contempt proceedings should not be initiated

12  against them with respect to their involvement in this case.

13     The order directed written responses from both

14  attorneys, and both counsel complied.  Mr. Lento's submission

15  was timely received and is at Docket Entry Number 24 in this

16  case.  Mr. Adams' submission was also timely received and is at

17  Document Entry Number 20 in this case.

18     Today's hearing is designed to afford the Court an

19  opportunity to ask some questions of the respondents, but also

20  to afford them an opportunity to address the Court directly and

21  provide any statements or arguments that they may wish in

22  respect to this issue.

23     To be clear, this is not a contempt hearing this

24  morning.  This is simply part of the Court's fact-finding

25  process to determine whether a contempt hearing would, in fact,

4

 1    be warranted based on these facts.  I'll note that the specific

 2    rule at issue in this case is the Court's Local Civil Rule

 3    83.5(c), which reads, in pertinent part, that any person who is

 4    not admitted to the Bar of this Court and who pretends to be

 5    entitled to do so shall be in contempt of this court and

 6    subjected to appropriate punishment.

 7         The way in which I intend to proceed today, Gentlemen,

 8    is that I'm going to start first with Mr. Lento, and then I will

 9    move on to Mr. Adams.  I'm going to have, in a minute, the clerk

10    swear both of you in, and then I'll have you up at the podium

11    for purposes of our discussion today.

12         I have a number of questions that I'd like to put to

13    each of you with respect to this case.  I'd like to work my way

14    through all of those questions; and then, of course, I will

15    afford each of you the opportunity to make any statement,

16    provide any additional information or provide any argument to

17    the Court that you may wish with respect to this proceeding.

18         But before we get into any substance, I will note that

19    this hearing was slated to begin at 9 a.m. this morning.  We are

20    starting, instead, at 12:30 in the afternoon.

21         Mr. Lento, I am informed that for some reason you

22    appeared at the Court's Augusta Division this morning for this

23    hearing.  Is that correct?

24         MR. LENTO:  Yes, Your Honor.  And I do apologize to His

25    Honor and everybody in the courtroom.  I have no excuse for the

5

1    error on my part, but I did appear in Augusta, Georgia, this

2    morning.

3              THE COURT:  I understand.  Thank you.

4              All right.  I'll ask Mr. Lento and Mr. Adams to both

5    please stand, and I'll have the clerk administer you an oath.

6    If you'll please raise your right hands.

7              THE CLERK:  Do you solemnly swear or affirm the

8    testimony you give in this case will be the truth, the whole

9    truth, and nothing but the truth so help you God?

10             MR. LENTO:  I do.

11             MR. ADAMS:  I do.

12             THE COURT:  Record will reflect both attorneys gave

13   their affirmative response.

14             Mr. Lento, if I could have you at the podium, please.

15             So, Mr. Lento, if I could start with just some very

16   basic background information.  And I'll ask you to keep that

17   microphone up as close to your mouth as you can.

18             First of all, sir, just your full name, if you would.

19             MR. LENTO:  Sure.  It's Joseph Derek Lento.

20             THE COURT:  And how old are you, sir?

21             MR. LENTO:  I am 48 years old.

22             THE COURT:  Okay.  Where did you attend law school,

23   Mr. Lento?

24             MR. LENTO:  Temple University Law School.

25             THE COURT:  In Philadelphia.

6

1          MR. LENTO:  Yes.  Yes, Your Honor.

2          THE COURT:  And what year were you graduated?

3          MR. LENTO:  2008.

4          THE COURT:  Okay.  In what states are you admitted to

5     practice law?

6          MR. LENTO:  I'm admitted to practice law by the State of

7     New Jersey and the State of New York.

8          THE COURT:  Okay.  I understand that you were previously

9     admitted to practice in the State of Pennsylvania; is that

10    correct?

11         MR. LENTO:  That's correct, Your Honor.

12         THE COURT:  And I understand that the Supreme Court of

13    that state entered a five-year suspension order on November the

14    19th of last year; is that right?

15         MR. LENTO:  That is correct, Your Honor.

16         THE COURT:  Do you know if either New York or New Jersey

17    are or have instituted any reciprocal discipline process as a

18    result of Pennsylvania's decision?

19         MR. LENTO:  Yes, Your Honor.  I had notified, of course,

20    per my obligation, New York and New Jersey and the federal

21    districts where I was admitted, New Jersey essentially taking

22    everything that Pennsylvania regarded as correct, and I

23    respectfully have my own position regarding certain matters.

24    New Jersey is essentially recommending a six-month to one-year

25    suspension.

7

1          New York State is still in the process of reviewing the

2     matter.

3          I'm still addressing the Pennsylvania matter further,

4     because I take -- I accept the responsibility regarding certain

5     matters, and I take exception to various other matters of the

6     Pennsylvania matter.  And that's stated respectfully.

7          THE COURT:  Okay.  Thank you.  I'd like to next, if I

8     could, talk about some of the various Lento law businesses with

9     which you are affiliated and with which, I think, the plaintiff,

10    Dr. Gosse, may have interacted at one time or another.  And I'd

11    like to start first with the entity that is known as the Lento

12    Law Firm, LLC.

13         I understand that this is a business entity that was

14    formed in New Jersey back in 2020, and my review of your

15    submission to the Court seems to suggest, if I understand

16    correctly, that when Dr. Gosse executed the three-page $350

17    consulting agreement with you on or about May the 21st of 2025,

18    it was with Lento Law Firm, LLC that she was making an

19    arrangement at that time.  Is that correct?

20         MR. LENTO:  If I may respectfully clarify, Your Honor,

21    the Lento Law Firm, LLC, which is a entity to this day -- that's

22    essentially the practice that I started day one out of law

23    school in 2008.  The Lento Law Group, P.C., that was started in

24    or about February of 2019.  Dr. Gosse, she had first contacted

25    the Lento Law Firm in or about -- I know it was 2022, per my

8

1    investigation into the matter, and that would have been with the

2    Lento Law Firm.  She came back for a second consultation in

3    April of 2024, also with the Lento Law Firm.

4           Regarding the first consultation that was conducted by

5    me in 2022, I believe it was November of 2022, my understanding

6    is that she just the declined to proceed or there may not have

7    been anything to proceed with at that time.  In April of 2024,

8    that's when she engaged the Lento Law Group, P.C., or Lento Law

9    Group -- I mean is --

10           THE COURT:  And we'll come to that.

11           MR. LENTO:  Sure.

12           THE COURT:  Let me just stay with --

13           MR. LENTO:  Sure.  Thank you.

14           THE COURT:  -- the Lento Law Firm, LLC.

15           MR. LENTO:  Yes.

16           THE COURT:  Lento Law Firm, LLC had a three-page

17   document that said Lento Law Firm in the top of it, and it's

18   where you also had some language about the states in which you

19   were admitted, the fact that you have lawyers in multiple

20   states, but not necessarily all states, and that *pro hac vice*

21   admission would be sought as needed.  Is that correct?

22           MR. LENTO:  That's correct, Your Honor.

23           THE COURT:  Okay.  So that entity, the Lento Law Firm,

24   LLC, is that the entity -- when Dr. Gosse signed this three-page

25   consultation agreement on May the 21st of 2024, is the Lento Law

9

1    Firm, LLC, the entity with which she was contracting for that

2    initial consultation?

3            MR. LENTO:  Yes, Your Honor.

4            THE COURT:  Okay.  Who provided that initial

5    consultation to Dr. Gosse?

6            MR. LENTO:  The actual consultation itself?

7            THE COURT:  Yes, sir.

8            MR. LENTO:  Like conducted the phone consultation, in

9    other words?

10            THE COURT:  Who spoke with her by phone?

11            MR. LENTO:  Sure.  It was my firm administrator, John

12    Groff, and I believe it was my Alabama managing attorney, Joseph

13    Cannizzo, per my investigation into the matter.  That was April

14    of 2024.

15            THE COURT:  Now, I know you're saying April.  I'll just

16    note that the document you submitted to the Court, she signed on

17    May the 21st of 2024.  Do you think it's possible the

18    consultation was later than April?

19            MR. LENTO:  Based on my investigation, I would think

20    not.  I mean, a consultation would typically take place before

21    representation would ensue.  I'm not sure what His Honor is

22    referring to.  I don't know if that may be the --

23            THE COURT:  So I'll just read to you what I have.

24            MR. LENTO:  Sure.

25            THE COURT:  So you submitted as Exhibit B to your

1    submission, and it's docketed on the Court's docket entry at

2    Docket 24-1, Pages 9 through 11, a three-page document that says

3    Lento Law Firm at the top.  Ms. Gosse -- Dr. Gosse filled in her

4    name, and it required a $350 consultation fee.  It was signed by

5    Lento Law and then signed by Dr. Gosse and dated May the 21st of

6    2024.  And your submission suggests that this was the

7    consultation agreement with Lento Law Firm, LLC.  So I'm just

8    trying to confirm that that date is right.

9          MR. LENTO:  Sure.  I mean, that would refer -- I mean,

10    typically the three-page form, and if it's reflecting a $350

11    consultation fee, that would be for purposes of the

12    consultation.  Like if there's some error somewhere along the

13    way between April or May, I mean, just to put things simply at

14    the moment, that would be the consultation engagement letter.

15          THE COURT:  Okay.  But you were not -- you did not get

16    on the phone with Dr. Gosse to conduct that initial consultation

17    with her with the Lento Law Firm, LLC; is that correct?

18          MR. LENTO:  Not -- not in 2024, correct.

19          THE COURT:  Okay.  Had you spoken with her by phone two

20    years earlier when she called?

21          MR. LENTO:  Best of my recollection and per my

22    investigation into the matter, I would have, or I did.

23          THE COURT:  Did you, through the Lento Law Firm, LLC,

24    form an attorney-client relationship with Dr. Gosse in that May

25    2024 consultation for which she paid $350?

1          MR. LENTO:  I appreciate His Honor's question.  Much of

2     our practice is, say, organizational-level help.  Just to put

3     things in a different context, for example, a student, a

4     resident, whatever the case may be, they may contact us about

5     like a Title IX matter, for example.  In the engagement letter

6     or the consultation engagement letter, there is the reference to

7     it's not the practice of law unless admitted *pro hac vice* as

8     we're serving as a, say, a student or client's advisor until

9     such time, say, it would otherwise be appropriate or required

10    steps would be taken where, say, it would be the practice of

11    law.  At the time of the consultation, because in many

12    instances, like, we don't have a full grasp of what the client's

13    issue is --

14         THE COURT:  Let me interrupt, if I may.

15         MR. LENTO:  Sure.

16         THE COURT:  Is what you are leading to telling me that

17    you do not believe that any of the initial consultations carried

18    out by the Lento Law Firm, LLC, result in or involve the

19    creation of an attorney-client relationship with the person

20    who's reaching out to your firm?

21         MR. LENTO:  Bear with me, Your Honor.  I may have to

22    regard that like on a case-by-case basis, depending on the

23    nature of the inquiry, the nature of the help sought, the nature

24    of the discussion.

25         THE COURT:  All right.  Well, to that point, then, as

12

1    you point out, there is some language in Page 2 of this

2    document.  It's at Docket Entry 24-1, Page 10, where it says,

3    quote, "Our work is as a client's advisor and is not the

4    practice of law, unless admitted *pro hac vice*," which you just

5    mentioned a moment ago.

6            So in that sense, I guess you would say it suggests it

7    is not the practice of law.

8            A little higher up in the document, though, it says,

9    "The purpose of the consultation is to initially review and

10   assess the matter and help in making informed decisions moving

11   forward."

12           That sentence suggests to me that you'd have to have

13   some discussion of the facts of the client's potential case and

14   maybe offer some insight into going forward.  But am I reading

15   that wrong?

16           MR. LENTO:  No, no.  That would be accurate.  Like we

17   are trying to get a grasp of the person's issue and what steps

18   can be potentially taken and so forth through the course of the

19   consultation.

20           THE COURT:  With respect in particular to Dr. Gosse's

21   consultation, was it or was it not an attorney-client

22   relationship that was formed in that consultation with the

23   Alabama attorney you referenced earlier?

24           MR. LENTO:  I'm sorry.  Could you ask that again,

25   please, Your Honor?

1          THE COURT:  Yes, sir.  With respect to Dr. Gosse's

2    consultation in May of 2024, was it or was it not the formation

3    of an attorney-client relationship with the Alabama attorney you

4    referenced earlier?

5          MR. LENTO:  Your Honor, I apologize for answering in

6    this manner.  I don't know if I'm suited to answer that

7    definitive question.  I believe it may, in part, depend on what

8    may have been discussed, the nature of the issue at hand and so

9    forth.

10         THE COURT:  Okay.  So the answer is, because you didn't

11   participate in that conference, you don't know for sure.

12         MR. LENTO:  Your Honor, and I am answering as directly

13   as I can be, or as I can, that is.  Even if I conducted the

14   consultation myself, I still -- I know it can be a nuanced

15   consideration, and that's why it's -- not because I don't -- I'm

16   trying to give you a direct answer, so I --

17         THE COURT:  I appreciate that, and I don't suggest that

18   you're not being direct.  I'm just trying to be clear.

19         MR. LENTO:  Sure.

20         THE COURT:  Is the reason you don't know because you

21   weren't part of the conversation?

22         MR. LENTO:  Um, I mean, that may be a contributing

23   factor, but as I was about to say, like, even if I'm conducting

24   the consultation myself, is it actually invoking a attorney-

25   client relationship?  I would have to actually, like, look into

14

1  that and research what would invoke an attorney-client

2  relationship.

3       I know that may seem like a basic consideration, but in

4  many instances, things may not be as, say, basic as they may

5  seem.  And, again, I'm trying to be direct.  I'm not trying to

6  not answer your question as best as I can.

7       THE COURT:  I appreciate that, Mr. Lento.  If you could

8  give me the name of the Alabama attorney again.

9       MR. LENTO:  Sure.  First name is Joseph.  Last name is

10 Cannizzo, C-A-N-N-I-Z-Z-O.

11      THE COURT:  Okay.  What's the relationship between

12 Mr. Cannizzo and the Lento Law Firm, LLC?

13      MR. LENTO:  Well, at this juncture, like, he's no longer

14 a employee.  He was a --

15      THE COURT:  Bad question.  In May of 2024, what was the

16 relationship between the Lento Law Firm, LLC and Mr. Joseph

17 Cannizzo?

18      MR. LENTO:  Mr. Cannizzo was the -- and -- and I'm

19 trying to get to your question.  He was the Alabama managing

20 attorney for the Lento Law Group.  The Lento Law Firm, LLC and

21 the Lento Law Group, P.C., as is referenced in my respectful

22 response, they are separate entities that do work

23 collaboratively together.

24      THE COURT:  Sure.  And we'll come to the Lento Law

25 Group, P.C.  But, specifically, with respect to the Lento Law

1   Firm, LLC, what relationship, if any, did Mr. Cannizzo have with

2   the Lento Law Firm, LLC, in May of 2024?

3          MR. LENTO:  Sure.  Your Honor, I may have to say it was

4   an informal relationship.  That may be the most accurate way to

5   put things.

6          THE COURT:  Well, let me come at it this way.

7   Mr. Cannizzo was not an employee of the Lento Law Group, LLC,

8   in May of 2024; is that correct?

9          MR. LENTO:  I'm sorry.  One more time, please.

10         THE COURT:  Mr. Cannizzo was not an employee of the

11  Lento Law Firm, LLC, in May of 2024; is that correct?

12         MR. LENTO:  That is correct.  Yes.

13         THE COURT:  Mr. Lento was not an independent contractor

14  of the Lento Law Firm, LLC, in May of 2024; is that correct?

15         MR. LENTO:  Mr. Cannizzo was not.

16         THE COURT:  Mr. Cannizzo did have some kind of

17  independent contractor relationship with the Lento Law Group,

18  P.C., in May of 2024; is that correct?

19         MR. LENTO:  He was affiliated with the Lento Law Group.

20  As to his exact classification, if he was like, say, an

21  employee, I'd have to confirm that.  Mr. Cannizzo had been with

22  us for a good number of years.

23         THE COURT:  Okay.  In point of fact, you were the only

24  employee of the Lento Law Firm, LLC, in May of 2024; correct?

25         MR. LENTO:  That is correct, Your Honor.

1          THE COURT:  Okay.  So I guess my question is, how was

2     the Lento Law Firm, LLC, carrying out this consultation with

3     Dr. Gosse in May of 2024 if no employee or contractor of Lento

4     Law Firm, LLC, actually met with her or got on the phone with

5     her to conduct that consultation?

6          MR. LENTO:  I can appreciate what His Honor is asking.

7     I would have to ask, though, could you ask the specific question

8     again, please?

9          THE COURT:  Sure.  If you're the only employee of the

10    Lento Law Group, LLC, and you didn't meet with Dr. Gosse when

11    the initial consultation that she paid for was carried out, how

12    did the Lento Law Firm, LLC, actually fulfill its obligation to

13    consult with her if no employee or contractor of the entity

14    actually was the one who talked to her?

15         MR. LENTO:  I appreciate what His Honor is asking.  I

16    would have to reference the consultation engagement letter.  I

17    know there's been variations over the years as we try to, say,

18    refine our services and efforts towards clients and also just in

19    terms of obligations.

20         THE COURT:  I guess what I'm asking is, even though she

21    signed an agreement with the Lento Law Firm, LLC, for an initial

22    consultation, which you are characterizing as not creating an

23    attorney-client relationship, the person with whom she actually

24    consulted, Mr. Cannizzo, was, in fact, a representative of the

25    Lento Law Group, P.C.; correct?

1          MR. LENTO:  That is correct, Your Honor.

2          THE COURT:  And that is the law firm which actually

3     filed the complaint in this case; correct?

4          MR. LENTO:  Yes, that is correct, Your Honor.

5          THE COURT:  So did an attorney-client relationship form

6     when Dr. Gosse spoke with Mr. Cannizzo?

7          MR. LENTO:  Going back to what I was saying earlier,

8     Your Honor, like, I don't know if I'm in a position to

9     definitively, like, answer that question, not because I would

10    not like to, but just in terms of if a attorney-client

11    relationship actually was formed.

12         Now, to go further, if I may briefly state --

13         THE COURT:  Please.

14         MR. LENTO:  Like, by the time the complaint's filed, for

15    example, like, then I would have no question.  Like, again, I'm

16    trying to be direct to His Honor.  By the time, like, the

17    complaint's filed and you're working with a client in that, say,

18    direct capacity for purposes of representation and so forth,

19    then, like, yes, I would have no question.  Not trying to sit

20    here and sound obtuse.

21         Going back to the consultation engagement letter, again,

22    there's been variations over the years.  I can't speak

23    definitively, but I believe there may be the reference to the

24    fact that, like, the Lento Law Firm can associate with, like,

25    others, but I'm not able to --

18

1          THE COURT:  So, again, I will look at the document you

2    submitted to the Court.  It's at Docket Entry 24-1, Page 10.  It

3    does include language similar to what you're talking about.  It

4    says, Per office policy, the standard considerations apply as

5    applicable and as determined by the firm, in quotation marks,

6    and/or its equivalent in this document, refers to the Lento Law

7    Firm and the Lento Law Group as your matter may be a

8    collaborative effort at the firm's discretion.  Is that the

9    language you're thinking about?

10          MR. LENTO:  Yes, Your Honor.

11          THE COURT:  Okay.  It is perhaps somewhat difficult for

12    a person receiving this document -- do they actually know

13    whether they're talking to the Lento Law Firm, LLC, or the Lento

14    Law Group, P.C.?

15          MR. LENTO:  Well, it would depend at what point in time.

16    I mean, essentially -- I mean, they are separate entities, as

17    His Honor, I believe, is aware.  But, I mean, by all accounts,

18    they are collaborative.

19          I can't go as far as saying they're one in the same,

20    because they're not, but, I mean, essentially, it's -- it's a

21    joint effort with the hope and goal of furthering a client's

22    cause under good circumstances or normal circumstances.

23          THE COURT:  So let's move on to that second entity, the

24    Lento Law Group, P.C.  As you and I agreed a moment ago, that is

25    the law firm that actually filed the lawsuit in this case;

19

1  correct?

2          MR. LENTO:  Yes, Your Honor.

3          THE COURT:  Okay.  And that entity was formed in New

4  Jersey in 2019; is that right?

5          MR. LENTO:  That sounds correct, Your Honor.

6          THE COURT:  Okay.  And that's a professional

7  corporation, a P.C.?

8          MR. LENTO:  Yes, Your Honor.

9          THE COURT:  And you are the majority shareholder of that

10  P.C.?

11          MR. LENTO:  That gets nuanced also, but I mean, yes, of

12  the Lento Law Group, P.C., that's correct.

13          THE COURT:  And you were, in fact, the majority

14  shareholder back in May of 2024, and you have been all that time

15  up through today; correct?

16          MR. LENTO:  Yes, Your Honor.

17          THE COURT:  Okay.  There's another attorney who's a

18  minority shareholder in that P.C., a Mr. Wayne Pollock; is that

19  right?

20          MR. LENTO:  Yes, Your Honor.

21          THE COURT:  Okay.  And you and he are the only owners of

22  this Lento Law Group, P.C.; is that correct?

23          MR. LENTO:  That's correct, Your Honor.

24          THE COURT:  Okay.  And you are the managing partner of

25  that firm; is that correct?

20

1    MR. LENTO:  Well, it's not the -- it's not a

2    partnership, Your Honor.  So at one point -- or for a good

3    length of time, yes, I was the managing attorney.  My role as

4    the managing attorney came to a conclusion, say, by the end of

5    2023 where --

6    THE COURT:  And what did it mean to be the managing

7    attorney of the Lento Law Group, P.C., up through the time you

8    say it ended in 2023?

9    MR. LENTO:  Sure.  The role of the managing attorney of

10   the Lento Law Group, P.C. encompassed many forms.  Largely, as a

11   managing attorney, I would say the main obligation is to try to

12   make sure that a client's matter or clients' matters are

13   proceeding as they should accordingly, that essentially the law

14   practice is acting in accordance with its obligations,

15   attorneys, staff, and so forth.  Essentially, it's an

16   overarching supervisory role.

17   THE COURT:  So when you were the managing attorney at

18   the Lento Law Group, P.C., which you tell me ended in 2023,

19   prior to it ending, you had supervisory authority over the law

20   firm's attorneys and support staff; is that correct?

21   MR. LENTO:  Overall, correct.  It does get a little more

22   nuanced for the simple fact that there are other offices of the

23   Lento Law Group.  Like, for example, there's a Michigan office.

24   There's a Arizona office.  There's a Florida office, which is

25   presently inactive.  They are their own, say, entities, where

1    the managing attorneys of those particular offices would be the

2    managing attorneys of those particular offices with their own,

3    say, managerial responsibilities.

4        THE COURT:  But you as the managing attorney for the

5    entire firm sat over the top of all of those other regional

6    managing attorneys; is that correct?

7        MR. LENTO:  I would not be able to go that far with it,

8    Your Honor.  It does get nuanced just based on, say, how the

9    practice is structured and so forth and the responsibilities and

10    obligations of the, say, attorneys, whether they're, say,

11    managing attorneys of the various offices or like an associate

12    under a managing attorney of a particular office.  That would

13    probably be the most accurate way of putting things.

14        THE COURT:  Okay.  So let me ask you this question.

15    I've had an opportunity to read the report and recommendations

16    of the disciplinary board of the Supreme Court of Pennsylvania

17    that were issued on July the 1st of 2024.  On Page 63 of that

18    report and recommendation at Paragraph 319, the following

19    language is contained:  Quote, "Respondent admitted that as the

20    managing partner of Lento Law Group, P.C., with supervisory

21    authority over his law firm's attorneys and support staff, that

22    respondent violated certain rules of professional conduct in

23    Pennsylvania."

24        Did you, in fact, admit to the Pennsylvania licensing

25    authorities that you were the managing partner of the Lento Law

1    Group, P.C., with supervisory authority over your law firm's

2    attorneys and support staff?

3            MR. LENTO:  Without anything in front of me at the

4    moment, Your Honor, I could definitively state that it would by

5    all accounts be that I didn't say that specifically for the

6    simple fact that -- and I had, you know, respectfully made the

7    correction.  It's not a partnership, so I -- I've never used the

8    term managing partner in any, say --

9            THE COURT:  You had said managing attorney.

10           MR. LENTO:  That's correct.

11           THE COURT:  Okay.  Now, you told me your role as

12   managing attorney of the firm ended in 2023; is that correct?

13           MR. LENTO:  That's correct, Your Honor.

14           THE COURT:  And what happened in 2023 to transition from

15   being the managing attorney to no longer being the managing

16   attorney?

17           MR. LENTO:  It was deemed by me that I no longer sought

18   to remain in that role, and steps were taken to have me no

19   longer serving that role.

20           THE COURT:  Did some other lawyer take over that role

21   for you?

22           MR. LENTO:  Yes.  Attorney Terrell Ratliff took over the

23   role of the managing attorney in January, or about January of

24   2024.

25           THE COURT:  Now, all of the attorneys who work -- let

23

1  me -- let's not -- I don't want to cast too broad a net.  Let's

2  talk about May of 2024 to present.  All of the attorneys who

3  have worked for the Lento Law Group, P.C., from May of 2024 up

4  through today, except for you, are not employees of that

5  organization; is that correct?

6        MR. LENTO:  I'm sorry.  Ask that again, please, Your

7  Honor.

8        THE COURT:  Sure.  That was badly phrased.  Keeping in

9  mind the time period from May of 2024 up through today, would it

10 be correct to say that none of the attorneys who work for the

11 Lento Law Firm, P.C., are employees of that organization?

12       MR. LENTO:  Lento Law Group, Your Honor?

13       THE COURT:  I'm so sorry.  I misspoke.  You're correct.

14 Lento Law Group, P.C.  Is it correct that none of those lawyers

15 are employees of the Lento Law Group, P.C.?

16       MR. LENTO:  We do have salaried workers, so if they're

17 not considered employees -- I say this respectfully, like, I'm

18 not an expert in employment law.  It, again, may seem basic, but

19 I mean, we have salary employees.

20       THE COURT:  You have salaried employee lawyers?

21       MR. LENTO:  Yes.

22       THE COURT:  And you also have independent contractor

23 lawyers?

24       MR. LENTO:  That's correct, Your Honor.

25       THE COURT:  Okay.  How many salaried employee lawyers do

24

1   you have at present?

2        MR. LENTO:  I'd have to confirm that, Your Honor.

3        THE COURT:  Are the majority of them independent

4   contractors?

5        MR. LENTO:  I would have to confirm that also.

6        THE COURT:  Okay.

7        MR. LENTO:  Your Honor, as --

8        THE COURT:  Please.

9        MR. LENTO:  I'm sorry.  Like -- and as was referenced by

10  me, we have had turnover, for better or worse.  So in terms of

11  being able to -- September 8th, 2025 -- I mean, I'd have to

12  confirm certain aspects of things, because with turnover, I

13  mean, there's basically new people, new team members and so

14  forth, different roles, different, say, contractual or terms

15  provided and so forth where I'm just not in a position today to

16  be able to say, like, X, Y and Z, for example.

17       THE COURT:  Okay.  I'm going to wind up coming back.

18  You were kind enough to supply the Court with a fair bit of

19  email correspondence, both internal to your practice and also in

20  your dealings with Dr. Gosse, and we're going to go through some

21  of that a little bit later, but I wanted to ask you about one in

22  particular right now.

23       At Docket Entry Number 24-1 at Pages 32 and 33 of the

24  record, one of the exhibits you submitted to the Court was an

25  email that you sent to Dr. Gosse on January the 17th of 2025.

1    And in the signature block of that email, the signature block is

2    Joseph D. Lento, Esquire, Attorney, Lento Law Group, Founder/

3    Managing Attorney.

4          And so I guess my question is, if your duties and

5    responsibilities as managing attorney ended in 2023, why did

6    your signature block to Dr. Gosse in an email on January the

7    17th of 2025 list you as the managing attorney of the firm?

8          MR. LENTO:  Sure, Your Honor.  And a couple of

9    explanations as to why that mayor (ph) was the case.  And it may

10   sound silly, but even to this day, I operate somewhat at a

11   technological disadvantage where, even, say, today, I'm not sure

12   what my signature block may reflect for the Lento Law Group.  I

13   know that may seem silly.  I don't regard it as silly, but it is

14   a potential constraint.

15         Now, after, like, Attorney Terrell Ratliff, who had

16   taken on the role of managing attorney from, as mentioned,

17   January of 2024 until he basically abruptly resigned in mid

18   December of 2024 -- and I'm glad to do so because my main and

19   sole mission is to try to move the ball forward for clients and

20   for our team.  If I have to step back or if I did step back into

21   that role for that period of time, because essentially we had

22   nobody to fulfill that role, various roles from the time that,

23   say, Attorney Terrell Ratliff left, probably mid December -- I'd

24   have to double check the date -- December 14th, December 16th,

25   2024, whatever the specific date was, until essentially we were

1     trying to take steps to find somebody to fill the need of those,

2     say, vacancies, including the managing attorney of the office.

3           THE COURT:  Okay.  All right.  So we've talked about the

4     Lento Law Firm, LLC, and we've talked about the Lento Law Group,

5     P.C.

6           I now want to ask you about a different entity.  So

7     after the initial consultation took place with Dr. Gosse, a

8     five-page engagement letter was then sent out to her on the

9     letterhead of the Lento Law Group.  It appears at Docket Entry

10    24-1, Pages 2 through 6 in the record of the case.  And I

11    presume this is your standard five-page engagement letter for

12    the Lento Law Group; is that correct?

13          MR. LENTO:  Your Honor, in looking at that engagement

14    letter, it is an engagement letter that is used at times by the

15    Lento Law Group.  Through my investigation into the issues at

16    hand here, my regard of that engagement letter that had been

17    provided to Dr. Gosse, that was not, say, the best intended

18    engagement letter.

19          Typically, if, for example, we're handling a litigation

20    matter with attorneys' fees to be earned through or awarded

21    through like a prospective settlement or judgment, and if

22    there's an advance on expenses required to be paid by the

23    client, for example, it's typically not that engagement letter

24    that had apparently inadvertently been sent to Dr. Gosse.

25          So on the one hand, yes, it's an engagement letter that

27

1    has or was used in the past, but was that the engagement letter

2    that should have been sent to Dr. Gosse?  Presumably not, again,

3    with the benefit of hindsight.

4         THE COURT:  Okay.  But, nevertheless, this five-page

5    engagement letter was sent to her.  It was signed by Lento Law,

6    dated May the 30th of 2024; and the following day, May the 31st

7    of 2024, she signed it, and there appears to be a Dropbox audit

8    trail here reflecting the completion of that agreement.

9         It required a payment of $15,000, which I understand

10   Dr. Gosse may not have paid immediately, but did pay in the

11   ensuing period of time.  Did an attorney-client relationship

12   exist as of the time of the execution of this engagement letter

13   by Dr. Gosse on May the 31st of 2024?

14        MR. LENTO:  And, again, as much as I would like to be

15   able to say yes or no, my instinct would lean towards yes, but

16   simply by her executing the engagement letter -- again, I know

17   this pertains to Dr. Gosse's case and issue, but, again, not to

18   muddle the discussion or the answer -- I don't -- from a ethical

19   or contractual obligation, I'm not in a position to be able to

20   say definitively if just the execution of the engagement letter

21   would invoke an attorney-client relationship.

22        THE COURT:  Well, let me ask this question.  There had

23   to be an attorney-client relationship by the time the complaint

24   was filed in this lawsuit.  Is that fair?

25        MR. LENTO:  I can -- yes, Your Honor.  I mean, that is

1    something that I -- I can say that would seem more than

2    reasonable and correct.

3         THE COURT:  Do you know when between the date of the

4    execution on May the 31st of 2024 and I believe it was December

5    11th or 12th of 2024 when the complaint was filed -- are you

6    able to tell me when that attorney-client relationship between

7    your firm and Dr. Gosse came into being.

8         MR. LENTO:  I would submit, or tend to submit that it

9    would be when the team member or, say, attorney starts working

10   with a client, discussing, say, in -- as substantively as

11   possible as you're, say, past the stage of a consultation, which

12   in many instances is going to be, say, cursory to a degree, but

13   when you're, say, working with a client in an effort to, say,

14   prosecute their case, in this instance, say, a prospective

15   lawsuit against the program -- Your Honor, may I just grab a --

16        THE COURT:  Of course.  By all means.

17        MR. LENTO:  Thank you.

18        THE COURT:  You're most welcome.  Now, let me ask this

19   question, because obviously, you know, an attorney-client

20   relationship by definition requires an attorney, or some

21   attorneys, not just a firm.  Did you personally form an

22   attorney-client relationship with Dr. Gosse in connection with

23   her representation by the Lento Law Group, P.C.?

24        MR. LENTO:  My respectful submission would be, no, I did

25   not.

1       THE COURT:  Who were the attorneys associated with the

2   Lento Law Group, P.C., who did form an attorney-client

3   relationship with Dr. Gosse?

4       MR. LENTO:  Well, the case was assigned to attorney Kyle

5   Adams at a point in time, who started working with Dr. Gosse;

6   and at a later point in time yet, as His Honor is aware,

7   attorney Melissa Renza became involved in the matter.

8       THE COURT:  Both of these were independent contractor

9   lawyers of the Lento Law Group, P.C.?

10      MR. LENTO:  Mr. Adams could obviously speak to his

11  status.  I say that respectfully.  Mr. Adams may have been an

12  independent contractor.  Melissa Renza, as the managing attorney

13  of the -- we'll say the Florida office, my expectation -- I

14  would have to confirm -- would be that she would have a

15  different package, to use an informal term.  I mean, the

16  managing attorneys of the offices, such as like Florida when

17  it's active, or Arizona or Michigan, for example, and typically

18  they're equity owners of those offices.  But as to Ms. Renza's

19  specific terms and so forth, I would have to confirm that.

20      THE COURT:  I have one additional Lento-related entity

21  that I want to ask you about, and it pertains to the engagement

22  letter that we've been talking about.  There's a logo in the top

23  left side of the page that says Lento Law Group, but off to the

24  right it says Lento Law Group, Inc., 7047 East Greenway Parkway,

25  Scottsdale, Arizona.  Now, there is, in fact, a Lento Law Group,

30

1   Inc., a corporation that was formed in Arizona in 2022.  What

2   does the Lento Law Group, Inc. do?

3        MR. LENTO:  Well, the Lento Law Group, Inc., that is, as

4   His Honor had indicated, it was established, that's associated

5   with the Arizona office.  As to the details, I don't have them

6   at hand.

7        THE COURT:  It's a corporation.  Who are the

8   shareholders of Lento Law Group, Inc.?

9        MR. LENTO:  Of Lento Law Group, Inc.?  I would have to

10  get that information for His Honor.

11       THE COURT:  Are you the Lento by name, though, in that

12  Lento Law Group, Inc.?  Is it related to you?

13       MR. LENTO:  Well, I mean, in the sense that, like, I am

14  Joseph Lento.  Like, there's not -- there are other -- there's

15  actually another Joseph Lento, attorney in Massachusetts.  But

16  -- as far as I understand.  But, I mean, essentially, any

17  reference to Lento, like, is a -- it relates back to my name,

18  not that I'm necessarily, say, the owner or the shareholder.

19       THE COURT:  Do you know who the shareholders of Lento

20  Law Group, Inc., an Arizona Corporation, are?

21       MR. LENTO:  Not at the moment, I --

22       THE COURT:  Do you know who the officers and directors

23  of Lento Law Group, Inc., an Arizona Corporation, are?

24       MR. LENTO:  I could get that information for His Honor

25  as needed, of course.

1        THE COURT:  Does it have anything to do with the

2   practice of law and the provision of legal services to

3   Dr. Gosse?

4        MR. LENTO:  I would have to -- I'm just not in a

5   position to be able to speak to that, Your Honor.

6        THE COURT:  But to be clear, the Lento Law Group, P.C.,

7   the law firm, is the entity that you understood undertook the

8   attorney-client relationship to represent Dr. Gosse in her

9   lawsuit.  Is that correct?

10       MR. LENTO:  You said Lento Law Group, P.C.?

11       THE COURT:  Lento Law Group, P.C.

12       MR. LENTO:  That would be a fair statement as far as I

13   would understand.

14       THE COURT:  I mean, it's the name that appears in the

15   complaint as representing her.

16       MR. LENTO:  That seems reasonable, Your Honor.

17       THE COURT:  Okay.

18       MR. LENTO:  Your Honor, I know it gets -- I understand

19   this is His Honor's questions.  It gets nuanced in terms of just

20   the corporate structure and so forth.  And, I mean, I'm good at

21   certain things; I'm not good at everything.  I would be the

22   first to admit and to say that.  But as to some of the details,

23   I certainly can confirm as needed.

24       THE COURT:  Okay.  Are there any other Lento-named legal

25   entities that you're involved with that we haven't talked about

1   here today?

2        MR. LENTO:  I don't believe so, Your Honor.  Just, I

3   mean, the Lento Law Firm, LLC; Lento Law Group, P.C.; Lento Law,

4   Inc.  If there were, it would be some, say, variation of the

5   same simply for, say -- due to corporate structure and so forth,

6   but nothing beyond that that comes to mind, say.

7        THE COURT:  Are you the only lawyer named Lento who's

8   involved in these three organizations I've talked about?

9        MR. LENTO:  Yes.  Like, I'm the only, like, Lento among

10  our team, in other words.

11       THE COURT:  All right.  In the last 10 years, have you

12  practiced law under any other business entities or any doing

13  business as names besides what we've talked about already?

14       MR. LENTO:  Yes.  Well, the forerunner of the Lento Law

15  Firm, P.C., was at one point, like, the Law Offices of Joseph D.

16  Lento and Associates.  The Lento Law Group, P.C., actually

17  started out as Optimum Law Group in February of 2019, at which

18  point, say, in or about early 2020, we were contacted by, if I

19  recall now, it's been five years, but New Jersey, who basically

20  had indicated you can't practice under a trade name, to which we

21  changed it to Lento Law Group, P.C., to which New Jersey

22  actually changed that rule about, like, two months later.  But I

23  mean, just Optimum Law Group would be the forerunner to Lento

24  Law Group.

25            THE COURT:  Okay.  When Dr. Gosse first -- I know she

33

1    first came to your firm back in 2022.  I'm going to omit that

2    for the moment.  I want to focus on 2024.

3         When Dr. Gosse first came back to your firm for

4    consultation in 2024, did the Lento -- I've gotta make sure I

5    got my names right.  Did either the Lento Law Firm, LLC, or the

6    Lento Law Group, P.C., have any attorneys affiliated with either

7    of them who were admitted to practice in the Southern District

8    of Georgia?

9         MR. LENTO:  Sure.  And you had said in May of 2024?

10         THE COURT:  In May of 2024 when Dr. Gosse first came

11    back to the firm and signed the consultation agreement, did

12    either the Lento Law Firm, LLC, or the Lento Law Group, P.C.,

13    have any attorneys who were admitted to practice in the Southern

14    District of Georgia?

15         MR. LENTO:  I don't -- I don't believe so, Your Honor.

16         THE COURT:  And then 10 days later, when she signed the

17    retainer agreement, would the answer be the same, that you did

18    not have any attorneys who were admitted in the Southern

19    District of Georgia?

20         MR. LENTO:  That would seemingly be correct, Your Honor.

21         THE COURT:  All right.  Did you ever affirmatively tell

22    Dr. -- let me strike that.  Have you actually spoken to

23    Dr. Gosse by phone or in person or video chat at any time?

24         MR. LENTO:  Sure.  My recollection would be that I spoke

25    to her in, say, November 2022 at the time of the first

34

1   consultation.

2       THE COURT:  Other than the '22 consultation, have you

3   ever again spoken directly?  I know you've emailed, but have you

4   ever again spoken directly with Dr. Gosse, either in person, by

5   phone, or video chat?

6       MR. LENTO:  Definitely not in person and not by video

7   chat, and I don't believe by phone either, Your Honor.

8       THE COURT:  Okay.  Have you at any time ever represented

9   to Dr. Gosse that you were admitted to practice either in the

10  State of Georgia, or more specifically, in the U.S. District

11  Court for the Southern District of Georgia?

12      MR. LENTO:  Well, absolutely not.  And I never would say

13  anything like that.

14      THE COURT:  Okay.  What about the inverse?  Did you ever

15  expressly tell her that you were not admitted in the Southern

16  District of Georgia?

17      MR. LENTO:  Well, I mean, in the sense that my

18  consultation fee agreement has always stated my licensure, in

19  addition to online collateral, always stating the same, that,

20  say, when any interactions that I had with Dr. Gosse, I was

21  admitted in the three states:  Pennsylvania, New Jersey, and New

22  York.

23      THE COURT:  Sure.  So let's look at that.  Obviously --

24  and you've highlighted that for the Court's consideration.  Your

25  letterhead, which appears on the three-page consultation

35

1    agreement that we discussed earlier, says Lento Law Firm, a

2    national law firm with offices nationwide, helping clients

3    nationwide.  Corporate office, 1500 Walnut Street, Suite 500,

4    Philadelphia, PA 19102.  It lists the phone number.  It lists an

5    email at studentdisciplinedefense.com.  That's

6    joseph@studentdisciplinedefense.com.  That's your email address;

7    correct?

8          MR. LENTO:  Yes, Your Honor.

9          THE COURT:  Okay.  And then underneath it says, Attorney

10   Lento, licensed in Pennsylvania, New Jersey and New York; Lento

11   Law attorney team members, associates and affiliates licensed in

12   various states, and then in parentheses, not all.  *Pro hac vice*

13   admission will be sought as applicable.  Okay.  So what you are

14   telling me is that you believe that that letterhead by

15   implication conveys the information.  But I want to just ask

16   this more expressly.

17          Did you ever expressly inform Dr. Gosse that you were

18   not admitted in the Southern District of Georgia?

19          MR. LENTO:  I -- I can't recall a conversation in --

20   when I spoke to her in November 2022.  I didn't speak to her in

21   2024.  So, again, I didn't speak to Dr. Gosse in 2024.  I can't

22   recall 2022, if that -- if -- certainly if that was asked, I

23   would have accurately answered, but I can't recall otherwise

24   because it's such a length of time ago.

25          THE COURT:  Okay.

1       MR. LENTO:  And you just -- I mean, that's really -- I

2  mean, at best, I don't recall.  I don't recall anything of that

3  prior discussion in November of 2022.

4       THE COURT:  Did any licensed Georgia attorney review

5  either of these two engagement letters before they were sent to

6  Dr. Gosse, either the three-page consulting engagement letter or

7  the five-page litigation engagement letter?

8       MR. LENTO:  I would -- no Georgia attorney reviewed my

9  engagement letter for the Lento Law Firm consultation engagement

10  letter.  I would be speculating, but I don't believe a Georgia

11  attorney reviewed the Lento Law Group, P.C., representation

12  engagement letter.

13       THE COURT:  I understand that an attorney named Melissa

14  Renza became affiliated with your firm in approximately the

15  November or December timeframe of 2024.  Is that correct?

16       MR. LENTO:  I believe it was November 2024, Your Honor.

17       THE COURT:  Was she the first attorney admitted to

18  practice in the Southern District of Georgia who had come to

19  work with the Lento Law Group, P.C., since the time Dr. Gosse

20  first became a client?

21       MR. LENTO:  I believe that -- well, first became a

22  client...

23       THE COURT:  In May of 2024.

24       MR. LENTO:  I'm speculating, but I believe that would be

25  correct.

1          THE COURT:  And I understand that Ms. Renza left her

2     affiliation with your firm on or about January the 10th of 2025.

3     Since her departure, has there been any other attorney

4     affiliated with the Lento Law Group, P.C., who has been admitted

5     to practice in the Southern District of Georgia?

6          MR. LENTO:  At a prior point in time I am reasonably

7     confident that the answer would be no to date.  And, again, as

8     mentioned, there's turnover, and with turnover comes new team

9     members, but I don't believe there's anybody at present either.

10    It actually relates to the issue at hand in terms of trying to

11    press Dr. Gosse's case forward, after Ms. Renza came to depart,

12    and along with myself and His Honor in terms of being here

13    today.  I don't believe there is anybody at present.

14         THE COURT:  Okay.  So phrased differently, in the

15    roughly 16-month period that Dr. Gosse has had an established

16    attorney-client relationship with your firm, there was only a

17    seven-week window of time in which your firm actually had an

18    attorney associated or affiliated with the firm who could

19    actually practice in this court; is that right?

20         MR. LENTO:  Yes, that would be correct.  I mean, the

21    expectation was that Ms. Renza would not be, say, departing in

22    January, of course, but that is what came to take place.

23         THE COURT:  Okay.  Did anyone at the Lento Law Group,

24    P.C., ever actually inform Dr. Gosse that Ms. Renza was working

25    on her case?

38

1      MR. LENTO:  I -- because I never had a discussion with

2  Dr. Gosse, it obviously couldn't be me.

3      Bear with me, Your Honor.  I don't -- I don't know the

4  answer to that question, Your Honor.  I -- I know Mr. Adams is

5  right behind me, obviously, and it's said respectfully.  But I

6  know there's correspondence to communication in December 2024

7  prior to filing.  What was conveyed specifically to Dr. Gosse at

8  that time, I didn't have the benefit of any, say, firsthand

9  discussion, if there was -- if there was discussion of that

10  nature.  So I can't -- I can't speak to that.  But that did not

11  come from me at any point in time, again, to reiterate, because

12  I had not spoken to Dr. Gosse, as far as I recall, since

13  November of 2022, or so.

14      THE COURT:  Are Mr. Kyle Adams and Ms. Melissa Renza the

15  only two attorneys associated with the Lento Law Group, P.C.,

16  who represented Dr. Gosse?

17      MR. LENTO:  I believe that is correct, Your Honor.

18      THE COURT:  Okay.  And both of those attorneys,

19  Mr. Adams in December of 2024 and Ms. Renza just a few weeks

20  later in January of 2025, left their employment or their

21  independent contractor status with your firm; correct?

22      MR. LENTO:  Yes.  Yes, that is correct, Your Honor.

23      THE COURT:  What attorney was assigned to take over the

24  responsibility for the representation of Dr. Gosse after

25  Ms. Renza resigned on January the 10th of 2025?

1          MR. LENTO:  Sure.  And that's -- what's referenced in my

2   respectful response, Your Honor, that's part of that

3   administrative nightmare that we attended to and continue to

4   attend to to this day.  I don't believe there was an attorney

5   officially or a team member attorney assigned to Dr. Gosse after

6   Mr. Adams or Ms. Renza came to no longer be members of the team.

7          We had a -- it was likely, as was referenced, hundreds

8   of cases that we're actually still working through to this day

9   to try to make sure that they're attended to as needed to press

10  clients' matters forward and so forth.

11         We also did have difficulty, as was referenced, in terms

12  of finding local counsel in this matter.

13         THE COURT:  But just to be clear, as far as you know,

14  after Ms. Renza left in January of 2025, no successor counsel at

15  the firm was ever assigned to Dr. Gosse's case; is that correct?

16         MR. LENTO:  I believe that is correct, Your Honor.

17         THE COURT:  Okay.  Did anyone inform Dr. Gosse that as

18  of January the 10th of 2025, that your firm would be unable to

19  represent her in the Southern District of Georgia?

20         MR. LENTO:  I don't believe that was indicated to

21  Dr. Gosse.  I do know that there was an email sent by me to

22  Dr. Gosse, I believe it was in January 2025, referencing that

23  Mr. Adams was no longer with the team, but we'd be taking steps

24  forward.  As to what those steps would be, I mean, we were

25  working through that, and the plan was to find successor

40

1    counsel so that we could continue forward with the matter.

2           THE COURT:  All right.  Well, to that same point, let's

3    actually look at some of the email correspondence between you

4    and Dr. Gosse.  There was an email that Dr. Gosse sent to you on

5    January the 15th of 2025.  This is at Docket Entry 24-1, Page 34

6    of the record.  And in this email, among other things, she said,

7    let me know who to contact or who my new lawyer is.

8           Then, two days later, on January the 17th of 2025, you

9    sent a responsive email to Dr. Gosse, and that was -- let me

10   find that now.  Bear with me just a moment.  It's at Docket

11   Entry 24-1 and at Page -- where did I put that?  Oh, yeah, here

12   we go.  It's at 24-1.  It starts on Page 32 and runs to Page 33.

13   And you have a line in here that says, "As to steps forward, a

14   team member will be stepping in to press forward on your behalf

15   per the engagement."

16          So who was the team member to whom you were making

17   reference in your email to Dr. Gosse of January 17th that was

18   going to, quote, step in and press forward?

19          MR. LENTO:  I don't believe I had somebody specific in

20   mind, Your Honor.

21          THE COURT:  Moving over to February the 4th of 2025,

22   there's an email at Docket Entry 24-1, and it covers Pages 36

23   and 37.  This email is on February the 4th at 12:02 p.m.  It is

24   Dr. Gosse following up to you.  And in fairness, a number of

25   other people are copied on this email as well.  And among the

41

1     things that Dr. Gosse says in this email, quote, "I do not have

2     a lawyer to reach out to.  I understand Kyle is no longer with

3     the firm, and I will be placed with a new lawyer."

4          And a little further on, at the end of the email, she

5     writes, "I am at a complete loss here in terms of who to contact

6     or where we stand with my case.  I would love to discuss my case

7     with someone, please."  Then -- that was at 12:02 p.m. on the

8     4th of February.

9          You sent an internal email about two-and-a-half hours

10    later, at 2:37 p.m., to John Groff, David Haislip, Sal Raie,

11    Yolanda Trujillo, and an intake manager email address.  I

12    understand these to all be folks who work with your firm.  This

13    appears at Docket Entry 24-1, Pages 37 through 38.  And the

14    question that you posed to all these folks in your firm is,

15    quote, "Does anyone know where we are with this?"  Referencing

16    Dr. Gosse's case.

17         At 3:00 that same day, Mr. Groff responds to the email,

18    says, "Yes k am handling it it was filed."

19         And then at 3:05 p.m. you respond to the entire group,

20    Roger - can I just email the client and basically say, quote,

21    your matter is being handled and we will be following, followed

22    by two question marks.

23         Now, Mr. Groff, who told you he was handling it --

24    Mr. Groff is not an attorney; correct?

25              MR. LENTO:  That's correct.

42

1     THE COURT:  Okay.  And why were you asking your

2 colleagues about whether you could say to the client, quote,

3 "Your matter is being handled and we will be following"?  Why

4 were you asking them whether that was an appropriate email to

5 send to the client?

6     MR. LENTO:  I wanted to try to get information from our

7 team as to the status and plan steps forward with the matter as

8 we were, again, trying to address the fallout.  And,

9 essentially, I used the term before, but it was and is an

10 administrative nightmare from the turnover, to put things

11 simply.

12     So I was asking Mr. Groff, he's the firm administrator,

13 he would have a sense overall in terms of, say, what we may have

14 in mind or, say, suggestions as to trying to address various

15 client matters.  And that's why I was seeking just input in

16 terms of trying to get a status update so that I could provide a

17 reasonable response to the client as we're, again, trying to

18 take measures to remediate the -- and mitigate the situation at

19 hand.

20     THE COURT:  Well, and to that point, in terms of

21 responding to the client, that evening, at 6:34 p.m., you

22 sent -- again, still on February 4th.  You sent a responsive

23 email to Dr. Gosse.  This is at Docket Entry 24-1, Page 42.  And

24 among the things that this email said, "Mr. Adams' cases are

25 being reassigned on a time-sensitive basis and a team member

1  will be following up to next steps.  We do not have a timeframe

2  at this moment, but we will be following up as to next steps as

3  soon as possible."

4       In this February 4th, 2025 email, did you have a

5  specific team member that you were referencing who was going to

6  follow up with Dr. Gosse?

7       MR. LENTO:  No, Your Honor.  I'm saying that in the

8  general sense.

9       THE COURT:  At the time of this exchange on or about

10  February the 4th of 2025, did anyone, including you, at the

11  Lento Law Group, P.C., inform Dr. Gosse that at that point there

12  were no Lento Law Group, P.C., lawyers admitted to practice in

13  the Southern District of Georgia?

14       MR. LENTO:  I'm sorry.  Ask that again, please, Your

15  Honor.

16       THE COURT:  As or around about the time of this

17  communication on February the 4th, did you or any of the

18  others -- other lawyers affiliated with the Lento Law Group,

19  P.C., inform Dr. Gosse that there were no Lento Law Group, P.C.,

20  lawyers admitted to practice in the Southern District of

21  Georgia?

22       MR. LENTO:  Well, it wouldn't have been me, Your Honor,

23  because, again, I didn't have a discussion with Dr. Gosse in

24  that regard.  I don't believe I had sent -- I'm all but certain

25  I didn't send a written communication to her in that regard.

44

1    Was that communicated to Dr. Gosse by somebody else?  I believe

2    not.

3           And I understand His Honor has a -- I would take it to

4    be the case that His Honor has a position regarding how the case

5    went from, say, file -- among other matters, respectfully --

6    from filing to through the, say, winter-spring 2025.  Not -- I

7    will be the first to accept responsibility when there's

8    responsibility to be accepted.  I will always respectfully note

9    like if I take exception to anything, not with respect to His

10   Honor, but just more generally stated.

11          As Ms. Renza was the filing attorney, my -- I've been --

12   I've been through a lot.  I've been in the field for some time.

13   My understanding would be that the filing attorney would be

14   responsible for the case until the Honorable Court were to allow

15   otherwise.  We did not have a -- a attorney admitted to This

16   Honorable Court, as far as I understand, after Ms. Renza came to

17   depart, because if we did, I mean, certainly it would have been

18   so much -- I mean, for lack of a different word, like an easy

19   fix, so to speak.  But no, like to go to His Honor's question, I

20   don't believe that was communicated to Dr. Gosse.

21          THE COURT:  Okay.  And to be clear, Mr. Lento, I have no

22   position with respect to anything.  I'm simply trying to gather

23   the facts.

24          MR. LENTO:  And I say it respectfully, Your Honor.

25   I'm --

45

1          THE COURT:  So let's move on.  There's another email on

2     February the 20th of 2025.  It appears at Docket Entry 24-1, at

3     Pages 41 and 42.  This is an email from Dr. Gosse to you at

4     11:35 a.m., and just to quote a few pieces from it, things she

5     said in this email:  "Just hoping for an update on my case."  "I

6     would really appreciate discussing next steps with someone."  "I

7     really need legal assistance."  "Please, can I follow up with

8     someone?  I really need some help and answers to questions."

9          You responded to that email the same day, at 1:56 p.m.

10    It's contained in Docket Entry 24-1 at Page 40.  And your

11    responsive email reads, "Dear Dr. Gosse.  Hello.  We most

12    certainly appreciate the concerns and the potential ability to

13    pursue opportunities while an issue is seeking to be resolved.

14    Litigation is a process and often a long process.  Litigation

15    can take, for example, two to four years in many instances.

16          "Our team, copied here, may be able to provide a recent

17    update as to your case with us.

18          "Please reply all.

19          "Thank you."  Signed by you, Joseph D. Lento.

20          At or about this time on February the 20th of 2025, did

21    you inform Dr. Gosse at that point that there were no Lento Law

22    Group, P.C., lawyers admitted in the Southern District of

23    Georgia?

24          MR. LENTO:  No, Your Honor.  I mean, the email would

25    speak for itself, respectfully.

46

1          THE COURT:  Okay.  The next email is May the 7th of

2     2025, at 5:23 p.m.  It's contained in the record at Docket Entry

3     24-1, Pages 47 through 48.

4          In this email dated May the 7th, Dr. Gosse writes as

5     follows:  "Who is Melissa and why is this the first time I'm

6     hearing of her name?  Why have you not mentioned her before?

7     Why is everyone that was on my case no longer working with this

8     law firm?  I am very concerned about my future and you do not

9     seem to be.

10          "These responses," quote, "'As far as you understand?'"

11     end quote, "may have been confirmed,'" close quote, "are not

12     okay.  I cannot continue to read these generic unsure,

13     incompetent responses.  I've been waiting for a new lawyer since

14     December and now there is a Melissa and she is also not with

15     your firm?"

16          I paid you 15,000 United States Dollars, and you cannot

17     provide a straight answer or provide me with legal advice.

18     Again, very concerning.  Can I speak to someone who does

19     understand or someone who can confirm 100 percent?  These maybe

20     and generic responses are getting very old.  It's all I've heard

21     for months.  You told me before I was being assigned on a

22     time-sensitive basis.  Why is my case less important and on the

23     back burner?  Please do elaborate.

24          As far as I'm concerned, you've left me hanging for

25     months.  I got an email yesterday asking if I had filled a form

47

1    out from Courtney.  That's the most anyone has asked me about my

2    case since December.

3           I have a residency interview tomorrow that will be a

4    failure because my program is aware of my lawsuit.  How can they

5    be aware of my lawsuit when you have such vague, unsure answers?

6    They sure know more than I do.  It's embarrassing.

7           I need to speak to someone who is sure and understands

8    my case.  Have you even tried to place a new lawyer on my case?

9    What is the holdup?

10           Please provide further details and name of a lawyer."

11           You responded to this email that I just read at 8:10

12    p.m. that same evening, May the 7th.  It appears at Docket Entry

13    24-1 at Page 46.

14           "Dear Dr. Gosse:  As noted, we were providing a brief

15    and in part update by email.

16           "We are doing the same at this time in response to your

17    last email.

18           "Melissa is attorney Melissa Renza who worked for us for

19    a period of time.

20           "We are concerned with all client matters, including

21    yours of course.

22           "We will be pressing forward.

23           "As noted, we will be following up.

24           "Thank you.

25           "Joseph D. Lento."

1          Mr. Lento, I guess I have to ask this question.  Without

2   an attorney admitted to practice in this court, how were you

3   going to be pressing forward as you represented to the firm's

4   client in this email?

5          MR. LENTO:  Our hope and plan would be that we would be

6   able to secure an attorney to take the role or to step in for

7   Melissa Renza.  I had touched upon it earlier, and I defer

8   completely to the Honorable Court, but I have not, by all

9   accounts or in large part, say, practiced day to day for about

10  five years.  I work harder than I ever did, and that's fine, but

11  I don't, for example, like, generally, like, file a complaint in

12  federal court and, say, press matters forward in that capacity.

13         So as to, like, I do know certain things, though, and

14  this is what I had touched upon earlier also in the sense of I

15  know attorneys have certain -- attorneys have various

16  obligations, obviously.  But when you file a case, like, in a

17  court, federal court, state court, whatever the case may be, you

18  generally can't just walk away.  And I'm not trying to point

19  fingers at anybody.

20         More importantly than anything else, like, I hate the

21  fact that Dr. Gosse had to feel that way.  I don't agree with

22  everything she's saying, but I say that respectfully also.  But

23  as I'm responding, I'm responding to the best of my ability at

24  that time, because I don't have all the answers.  And we're

25  trying to make our way through a difficult situation.  And I do

1   mean that when I say that.  That's why I said it to Dr. Gosse,

2   like, we care about your case as we do all clients.  Like, could

3   things be done better in hindsight?  Absolutely.

4        I mean it when I say, like, my sole focus is to try to

5   do the best job possible for clients in a difficult job.  Was

6   this case handled as well as it could have been?  Did things

7   happen, say, beyond our reasonable control?  Yes.  That's not --

8   they're not excuses.  It's just context.

9        I'm sorry, Your Honor.  I'm kind of probably going off

10  on a tangent, but going, I believe, to what your question was --

11       THE COURT:  My question was how are you going to tell

12  her you're pressing forward when you don't have a lawyer who can

13  do it now?

14       MR. LENTO:  That is what I was about to say.  Again, the

15  hope and goal was to secure an attorney to step in to this

16  Honorable Court to be able to continue to press the matter

17  forward.

18       THE COURT:  And may I presume -- as I've asked you this

19  question at each interval, may I presume that at this time you

20  also did not inform Dr. Gosse that there were no Lento Law

21  Group, P.C., lawyers admitted to practice in this court?

22       MR. LENTO:  I believe that's correct, Your Honor.

23       THE COURT:  Okay.  Okay.  I have just one last email

24  exchange I want to look at, and that is found at Docket Entry

25  24-1 at Pages 45 and 46.

50

1          Dr. Gosse sent -- and this is a rather lengthy email,

2     but I do want to read it.  Dr. -- well, I'll read a portion of

3     it.

4          Dr. Gosse sent this email on May the 20th of 2025, at

5     10:13 a.m., and I'm just going to read a short portion.

6          "It is my understanding that you have no lawyer working

7     with your firm in Georgia with the federal bar.  Is that the

8     issue you've been trying to avoid discussing with me for all

9     these months?  When can I speak with someone regarding my case?

10    Where are you in the process of finding a lawyer to assign my

11    case to that is with the federal bar in Georgia?

12         "Please answer honestly and in detail.  Let me know your

13    availability for a phone call as well."

14         Now, that's just an excerpt.  It was a longer email, but

15    I read a portion of it.  You responded to that email very

16    promptly at 10:29 a.m. that same day, and you wrote, quote,

17    "Dear, Dr. Gosse.  Hello.  We are following up briefly and in

18    part.  We will coordinate a date and time with you to discuss

19    any questions or concerns you may have.  Thank you for your

20    understanding.  Joseph D. Lento."

21         May I assume that also on or about May the 20th of 2025,

22    you did not confirm for Dr. Gosse that the Lento Law Group,

23    P.C., had no lawyers admitted to practice in the Southern

24    District of Georgia?

25         MR. LENTO:  I don't believe so, Your Honor.

1      THE COURT:  Okay.

2      MR. LENTO:  Again, like, to reiterate, like, my

3  communications were, I mean, as His Honor has largely seen, if

4  not altogether seen, via email.

5      THE COURT:  There's one other issue that I wanted to

6  speak to you about with respect to the written submission that

7  you filed with the Court.  Near the end of your written

8  submission, you expressed a willingness to return Dr. Gosse's

9  $15,000 fee to her in connection with this matter.

10      All I can say with respect to that is that's an issue

11  between you and your client.  To the extent you may wish to

12  refund the fee to her, you are certainly free to do so.  I'm

13  certain Dr. Gosse would probably be appreciative, but that has

14  little to no -- probably just no bearing on the narrow potential

15  contempt issue that the Court is looking at.

16      I appreciate, generally, your willingness to do that,

17  but it just doesn't bear on the particular issue that I have.

18  To the extent you want to return the fee to her, by all means,

19  go ahead and do so.

20      Mr. Lento, you have answered all of the specific

21  questions that I wanted to put to you this afternoon, but as I

22  said at the outset, I would also afford you an opportunity to

23  make any statement or any presentation or any argument that you

24  may wish to make to the Court with respect to the question of

25  whether your conduct in this matter should or should not be

52

1    referred for contempt proceedings.  And so I'm happy to hear

2    from you on that topic.

3         MR. LENTO:  Thank you, Your Honor.  And I appreciate His

4    Honor's courtesy.  I had touched upon various matters in my

5    responses, respectful responses to His Honor's questions.

6         As mentioned a moment ago, and more importantly than

7    anything else, I wake up every day; I've woken up every day for

8    17 years at this point, trying to do the best job possible for

9    clients.  And this is not in any kind of woe is me manner, but I

10   personally deal with some undeserved burdens.  I'm not here to

11   be personal in that regard or to sidestep.

12        As I would hope, the email correspondence to Dr. Gosse,

13   as I had mentioned, you know, could things be done better in

14   hindsight?  Could things be said differently in hindsight?  Yes.

15   But what I would hope does stand out is the fact that His Honor

16   had made reference to the one statement of mine.  And, like, I

17   do care about Dr. Gosse, her case, all clients, trying to move

18   matters forward.

19        They're -- they're not excuses.  It's context.  We've

20   dealt with -- and due to the burdens, again, not to be personal,

21   but it's -- it's caused tremendous difficulties for a firm

22   where, again, I wake up every day, I go to bed every day with

23   the sole focus trying to do the best job possible for our

24   clients and our team also, because, I mean, it essentially is a

25   shared effort, but clients are the number one consideration, of

1    course.

2          So it is with the goal of trying to move Dr. Gosse's

3    case forward.

4          And I had touched upon this also, like, there are

5    certain things -- again, I'm very good at certain things.  I'm

6    not good at everything as to, like, the rules and requirements

7    of This Honorable Court or other matters at that, like, I

8    can't -- I wouldn't necessarily be the best judge of that.

9          So it's working in accordance with trying to move a

10   client's case forward.  I don't know if she would have the

11   benefit of doing so, and I think there could be certain

12   constraints.  But if Dr. Gosse was, like, here today, I would

13   say -- everything I'm saying to His Honor, I would say,

14   Dr. Gosse, I'm sorry, like the goal here was to press your case

15   forward to try to get you the justice that you deserve.  I

16   mean, Dr. Gosse is apparently facing injustice.  I know

17   injustice can happen in life.

18         I would hope His Honor -- and I say this

19   respectfully -- would understand that there was no willful

20   disobedience.  I hate to -- I hate to remind His Honor the

21   same, but even me being at the wrong courthouse today, I

22   apologize again --

23         THE COURT:  Rest assured, that will not be held against

24   you in any respect.

25         MR. LENTO:  I understand.  It's, unfortunately, because

1    I said to myself, and somebody may say like, Joe, you're being

2    silly for saying something like that, but I wound up in the

3    wrong courthouse because of the difficulties that we've been

4    persevering through, where if I didn't have these burdens that

5    affect me personally -- and like I said, I can't accept

6    responsibility -- I did accept responsibility for certain

7    matters.  I do take exception with a lot of other matters, and

8    there's more to that.  There's much more to that Pennsylvania

9    case than certainly what may be read, but it's made -- it's

10   made, unfortunately, some of our clients' situations or matters

11   not progress as smoothly as they would have as we try to work

12   through these challenges, because we are -- when I -- working on

13   a day-to-day basis -- again, my role has been different for

14   years at this point, and I work harder than ever, and that's

15   fine.  But we've helped thousands of clients over the years.

16   Did we always do the best job possible?  Maybe not.  Is this an

17   example of that?  Yes, I mean, to be frank.

18        But it's not with a -- it's not with a -- in my heart

19   and the heart of our team trying to do the best job possible for

20   our clients.

21        So to reiterate, if Dr. Gosse was here, I would say,

22   Dr. Gosse, everything I just said, I'm very sorry for any

23   burdens that you may have experienced due to this.  It

24   certainly was not intended.  I know His Honor had just

25   mentioned it, but whatever needs to be done on our end to try

1  to make a situation right, that's -- that's, you know, largely,

2  again, pressing forward, mitigating when possible, a lot of

3  mitigation through, say, the -- early 2005 [sic], even to this

4  day, we're still attending to it, but I would just ask that His

5  Honor -- or hope that His Honor would see that it was not any

6  kind of, say, willful disobedience in terms of not respecting

7  the Honorable Court, His Honor, anybody in this courtroom,

8  Dr. Gosse, most importantly.  And with that, I appreciate His

9  Honor's time in this matter.

10         THE COURT:  Thank you, Mr. Lento.

11         MR. LENTO:  Thank you.  I should have a seat?

12         THE COURT:  Please, if you would.

13         Mr. Adams, if I could have you at the podium, please.

14         MR. ADAMS:  Yes, Your Honor.  Prior, would you permit a

15  two-minute --

16         THE COURT:  By all means.  You need a --

17         MR. ADAMS:  Restroom break, please?

18         THE COURT:  Absolutely.  We'll take a brief recess.

19  This Court stands in recess.

20     (Proceedings stood in recess from 1:50 until 1:56 p.m.)

21         THE COURT:  All right.  Thank you.  Mr. Adams, good

22  afternoon.

23         MR. ADAMS:  Good afternoon, Your Honor.

24         THE COURT:  If you'd be kind enough to give me your full

25  name, sir.

56

1          MR. ADAMS:  Sure.  It's Kyle, K-Y-L-E, Anthony Adams.

2          THE COURT:  All right.  And how old are you, Mr. Adams?

3          MR. ADAMS:  29, Your Honor.  I'm sorry.

4          THE COURT:  29 years old.  Okay.  Where did you attend

5    law school?

6          MR. ADAMS:  That would be Mitchell Hamline.

7          THE COURT:  In Phil -- in, I'm so sorry, Minneapolis?

8          MR. ADAMS:  Yes, Your Honor.  St. Paul.  I'm surprised

9    that you knew it.  It's a smaller school.

10         THE COURT:  Did you do that through their in-person

11   program or their online program?

12         MR. ADAMS:  The blended program.

13         THE COURT:  Okay.  So partially hybrid, partially there

14   in person, partially remote?

15         MR. ADAMS:  Yes, Your Honor.

16         THE COURT:  What year did you graduate?

17         MR. ADAMS:  2021.

18         THE COURT:  Did I understand from your submission that

19   you did not begin work in the legal field immediately upon

20   completing your law degree?

21         MR. ADAMS:  That's correct, Your Honor.  So I was a

22   August graduate.  I didn't feel ready for the February bar just

23   because of the proximity of graduation.  So I waited for July.

24   Took July, did not get results until -- I'm sorry.  I keep track

25   of this by my daughter's age, so just bear with me one second,

57

1    please.

2              THE COURT:  Take your time.

3              MR. ADAMS:  Sat for the January bar, received results in

4    February of 2023.  At that point, I had a job that I liked in

5    private practice, in human resources, doing their labor and

6    employment compliance work.  So initially, I had stayed there

7    until April of 2024 when I decided that I wanted to give

8    litigation a shot.

9              THE COURT:  Okay.  In what state or states are you

10   admitted to practice?

11             MR. ADAMS:  Presently, Pennsylvania and New Jersey, with

12   their district courts as well.  And then I am pending before the

13   District of Columbia.

14             THE COURT:  Okay.

15             MR. ADAMS:  And -- sorry, I didn't apply there yet, so

16   I'll leave that one out.

17             THE COURT:  Okay.  Very well.  Was your -- well,

18   actually, I should verify.  Were you employed in some capacity

19   by the Lento Law Group, P.C., in April of 2024?

20             MR. ADAMS:  Correct, Your Honor.

21             THE COURT:  And were you an employee of that

22   organization or an independent contractor?

23             MR. ADAMS:  I was a salaried W-2 employee.

24             THE COURT:  Okay.  And where were you working physically

25   when you were working for the Lento Law Group starting in April

1   of 2024?

2        MR. ADAMS:  Predominantly remotely, notwithstanding

3   hearings and appearances.

4        THE COURT:  Did the firm have a physical office?

5        MR. ADAMS:  They did.

6        THE COURT:  Did you ever work in the physical office?

7        MR. ADAMS:  I visited it.  I visited there once to pick

8   up a parcel.

9        THE COURT:  Okay.  Did you have a supervisor when you

10  were working as an attorney at the Lento Law Firm, P.C.?

11       MR. ADAMS:  My work assignments predominantly came from

12  the firm's administrator, John Groff.

13       THE COURT:  Mr. Groff is not an attorney; correct?

14       MR. ADAMS:  Correct, Your Honor.

15       THE COURT:  Did you have any attorney who was directly

16  overseeing or supervising your work in any respect?

17       MR. ADAMS:  Initially?  Joseph Cannizzo looked over most

18  of my pleadings and filings and things like that.  Upon his

19  departure, it kind of became a whichever team member had

20  bandwidth for me and had the expertise in the area, you know.

21  So if it was a criminal matter that I was dealing with where

22  advice was sought, Attorney Ratliff was the one that I would go

23  to.  If it was a family law matter, Sam Jackson.

24       THE COURT:  But you didn't have some formal, rigid chain

25  of command mentor to whom you reported; is that correct?

59

1        MR. ADAMS:  No, Your Honor.

2        THE COURT:  What I said is right?

3        MR. ADAMS:  Yes, Your Honor.

4        THE COURT:  Okay.  Did you supervise the work of any

5   other lawyers when you were working at the Lento Law Group,

6   P.C.?

7        MR. ADAMS:  No, Your Honor.

8        THE COURT:  What was the nature of the practice in which

9   you were involved starting in April of 2024?

10        MR. ADAMS:  I'm sorry, Your Honor.  I don't follow the

11   question.

12        THE COURT:  Sure.  You told me that this was a -- you

13   went to this because it's a litigation job.  And my question, I

14   guess, is what types of litigation were you involved in?

15        MR. ADAMS:  Sure.  So I ran the gamut of most types of

16   litigation.  I handled some family law matters in predominantly

17   southeastern Pennsylvania, some criminal matters in southeastern

18   and central Pennsylvania, some general civil lit., some car

19   accidents, slip-and-falls, things like that, and some education

20   matters, which is where I found my passion and is now

21   exclusively the work that I do.

22        THE COURT:  Would you lump Dr. Gosse's case into the

23   basket of education-related cases?

24        MR. ADAMS:  I would, Your Honor.

25        THE COURT:  Had you worked on any education-related

60

1    cases before you were working on Dr. Gosse's case?

2        MR. ADAMS:  Yes, Your Honor.  I don't know an exact

3    number, you know, but I would say that I could count with two

4    hands, just to give you a ballpark.

5        THE COURT:  Had you filed complaints in federal district

6    courts prior to Dr. Gosse's case?

7        MR. ADAMS:  I did not file it, but I drafted it for

8    senior counsel, who ultimately did file it.

9        THE COURT:  And who would be an example of a senior

10   counsel for whom you -- not necessarily by name, but by

11   position.  If you didn't have a supervisor, what's a senior

12   counsel in the operation mean?

13       MR. ADAMS:  So when I use that term, I pretty much am

14   referring to anybody that's a senior associate title or managing

15   attorney title.  So those --

16       THE COURT:  So someone with greater longevity at the

17   firm than you would be a senior counsel?

18       MR. ADAMS:  Senior to me.

19       THE COURT:  Okay.  Okay.  Did you ever have any

20   conversations with Mr. Joseph Lento about Dr. Gosse's case?

21       MR. ADAMS:  If you'll just indulge me one second to

22   think on that.

23       THE COURT:  Sure.

24       MR. ADAMS:  I just don't want to mislead the Court.  I

25   believe he was copied on CC on an email to Mr. Groff that I sent

61

1    at one point.

2         THE COURT:  Other than your including Mr. Lento on a CC

3    of one email that you sent to Mr. Groff, can you think of any

4    other contact or communications of any type that you had with

5    Mr. Lento about Dr. Gosse's case?

6         MR. ADAMS:  About Dr. Gosse's case?  No, Your Honor.

7         THE COURT:  Okay.  How did Dr. Gosse's case come to you

8    in the first place?

9         MR. ADAMS:  So the predominant way that we were assigned

10   matters is the admin team, I believe at the direction of

11   Mr. Groff, would task the attorney to the case in our -- in

12   Lento's case management system, Clio, and then we would be

13   notified that we had a new case.  We would go in, listen to the

14   recorded consult, look at the notes, look at client-provided

15   documents.

16        THE COURT:  So what's the recorded consult?  Would there

17   be an audio recording made of some initial consultation with the

18   client?

19        MR. ADAMS:  Yes, Your Honor.  Yeah, it was usually a MP4

20   file that was loaded into Clio.

21        THE COURT:  Now, you told me that that's the manner in

22   which, generally, the cases were assigned to you.  Do you have a

23   specific recollection, though, of being assigned Dr. Gosse's

24   case and whether it complied with that practice?

25        MR. ADAMS:  Yes, it did, Your Honor.  I'm sorry.

62

1        THE COURT:  Okay.  So what did you do when you were

2   first assigned the case in terms of communicating with the

3   client?

4        MR. ADAMS:  Yeah, so I had reviewed the file.  I reached

5   out to Dr. Gosse.  And if I can just note for the record for one

6   second, I do wish to apologize.  In my written response, I had

7   put Miss Gosse.  I had used the wrong honorific, and I intended

8   no disrespect to her.

9        THE COURT:  Okay.  Thank you for that clarification.

10       MR. ADAMS:  Yes.  Yeah, I felt very bad about that.  So

11  I had a initial phone call with her just to introduce myself,

12  that I was from the Lento Law Group and that I would be helping

13  on her case.

14       I don't recall if it was that specific phone call or a

15  subsequent phone call where I explained to her that I was not

16  barred in this district and that I would be pursuing *pro hac*

17  *vice*.  And the reason that I can vividly remember that is I can

18  remember that I was leaving court, I believe, in Montgomery

19  County, Pennsylvania, sitting at a red light, and I provided her

20  what the English translation of *pro hac vice* was.  That's why it

21  kind of sticks out in my head.

22       THE COURT:  All right.  So in some conversation that you

23  had with Dr. Gosse, sometime between being assigned the case and

24  sometime before the complaint was filed --

25       MR. ADAMS:  Yes, Your Honor.

1      THE COURT:  -- you had a phone conference with her in

2  which you made clear to her that you were not a member of the

3  bar of this court; correct?

4      MR. ADAMS:  That's correct.  And I -- you know, again, I

5  don't remember if it was that phone call or a separate phone

6  call.  I did explain that local counsel would file it and that

7  once it was filed and there was a docket for me to *pro hac* onto,

8  that I would do so, because to my knowledge, there's no

9  mechanism to *pro hac* prior.

10      THE COURT:  Okay.  I think you're correct about that.

11      In terms of who this local counsel would be, did you, at

12  the time you were speaking with Dr. Gosse, know who the

13  particular person was who would sign the complaint and file it

14  in this court?

15      MR. ADAMS:  I did not, Your Honor.  And that's my

16  biggest regret in this case in looking back and where I accept

17  the most responsibility is I relied purely on the representation

18  that we had local counsel who would review this.

19      THE COURT:  Stop for a second.  Do you know who made

20  that representation to you from the firm?

21      MR. ADAMS:  I do -- my recollection tells me that it was

22  contained within the file as a note.  And I specifically

23  remember Dr. Gosse saying as well that she was told that we had

24  a Georgia lawyer on staff.  But as far as where the

25  representation came from, I'm not sure, Your Honor.

64

1      You know, but that is a piece that I take full

2  responsibility for.  I've since taken a CLE on the ethics of

3  multi-jurisdictional practice, and I learned a lot from it, you

4  know, to include that the obligation on me is not to simply rely

5  on the representation, but I should have personally verified and

6  spoke to.

7      THE COURT:  Was it your understanding from this -- I'll

8  just call it a note in the file.  Was it your understanding from

9  this note in the file that the local counsel was a lawyer either

10  employed by or an independent contractor of Lento Law Group,

11  P.C.?

12      MR. ADAMS:  I did not know at that time if they were

13  internal or external because I've been involved in cases where

14  both were true.

15      THE COURT:  Well, thank you.  You anticipated my next

16  question.  Was it possible that the local lawyer referenced in

17  the file was simply some lawyer who was a stranger to the Lento

18  Law Group, but would be willing to work with the firm on this

19  particular case?

20      MR. ADAMS:  Certainly possible, yes, Your Honor.

21      THE COURT:  Okay.  You just didn't know one way or the

22  other?

23      MR. ADAMS:  I did not, Your Honor.

24      THE COURT:  Did you make any -- well, strike that.  You

25  came to the firm in April.

65

1          MR. ADAMS:  Yes, Your Honor.

2          THE COURT:  Dr. Gosse apparently signed her engagement

3    agreement with the firm in May, around May the 31st.

4          MR. ADAMS:  Correct, Your Honor.

5          THE COURT:  When did you receive the file in this case?

6          MR. ADAMS:  Sometime in August of 2024, Your Honor.

7          THE COURT:  Okay.  Do you know why it took from May of

8    2024 to August of 2024 for the matter to be assigned to you?

9          MR. ADAMS:  I do not, and I -- unfortunately, my memory

10   is not as sharp on some of those details as I wish it was for

11   you.  I don't recall if I was the first lawyer that was on the

12   case.

13         THE COURT:  You anticipated my next question.  Did you

14   know if there were any other lawyers at the Lento Law Group,

15   P.C., who may have looked at it before you did?

16         MR. ADAMS:  I do not.

17         THE COURT:  Okay.  When you received the case in August

18   and began your process of communicating with Dr. Gosse, I

19   presume at some point you started putting together a draft of a

20   written complaint; is that correct?

21         MR. ADAMS:  Yes, Your Honor.  Um -- I'm sorry.

22         THE COURT:  Go ahead.

23         MR. ADAMS:  I went through the fact finding with her

24   and, you know, ascertaining who the parties were that she felt

25   wronged her.  She laid out the timeline for me, and that's kind

1    of what created my shell.

2        THE COURT:  Did Dr. Gosse supply you with independent

3    documentation that became part of the case file, or had that

4    material been gathered already before you became involved?

5        MR. ADAMS:  I believe it was largely gathered prior.

6    There may have been one or two documents or small samples of

7    documents that she provided subsequent that then wound up in the

8    file.  But if it was, it was one or two documents.

9        THE COURT:  Okay.  In the process of drafting the

10   complaint, and I'm excluding Ms. Renza from this whole

11   conversation yet.  We'll come to her in just a little while.

12   Not including her, did you ever share a draft of the complaint

13   with anyone else in the firm?  Did you ever seek input from any

14   of the more senior attorneys?

15       MR. ADAMS:  So I -- I'm gonna -- I'll be jumping forward

16   pretty significantly in timeline, if that's okay.

17       THE COURT:  That's fine.

18       MR. ADAMS:  As I realized that I'd be leaving the firm,

19   I uploaded the document to Clio.  I'm sorry.  If I can just back

20   up for one second.

21       THE COURT:  Yes, sir.

22       MR. ADAMS:  So I had dealt with multi-jurisdictional

23   matters first before with local counsel involved, and the way

24   that it had proceeded in those prior matters is that I did the

25   first draft as a junior lawyer, tried to get some reps in, some

67

1    practice, and then an internal senior lawyer redlined it.  And

2    then once the red lines were incorporated, that's what was

3    passed to local counsel for them to review.

4         That was my expectation for this case as well.  So when

5    I completed it, I put it in Clio.  This was around the time of

6    my resignation, which was November 12th of 2024, with my last

7    day scheduled for November 27th of 2024.  So I had flagged

8    within my letter this matter for reassignment, noted that the

9    complaint was in Clio, and my expectation was that it would then

10   be reviewed by whomever the firm felt should.

11        THE COURT:  And your submission to me suggests that you

12   believed you were coming up on the running of a two-year statute

13   of limitations in December of 2024; is that correct?

14        MR. ADAMS:  Yes, Your Honor.  The computation that I had

15   made would have been December 12th of 2024, which would post

16   date what my last day was supposed to.

17        THE COURT:  Was November 27th, in fact, your last date?

18   And the reason I ask that is simply that Ms. Renza's

19   correspondence with you about the complaint and some statements

20   she made to the Court in a prior hearing suggested to me that

21   she was interacting with you in the December timeframe.

22        MR. ADAMS:  Yes, Your Honor.  So --

23        THE COURT:  And, additionally, Mr. -- I'm so sorry.  In

24   addition, Mr. Lento's written submissions seem to suggest that

25   you may have been with the firm until December.  So can you

68

1    clarify that?

2         MR. ADAMS:  Yes, I can, Your Honor.  So the intent was

3    to fully depart from the firm on November 27th.  During my two

4    weeks, Mr. Groff had approached me and asked if I would like to

5    remain a contractor just for a very small subset of cases, I

6    think it was three or four, one of which was just a large case

7    that I had a keen interest in, and the other three were things

8    that I had originated.

9         As that statute of limitations closed in, I decided to

10   just take a look at the file to make sure that things were

11   running smooth.  Since I had touched it, you know, I wanted to

12   make sure that the client was taken care of, and I saw that it

13   had not been filed as of -- I believe this was on December 10th.

14        I had texted Mr. Groff -- I don't recall the exact

15   date -- asking who the internal local counsel was.  I didn't get

16   a response.  So I went down the list of lawyers on our website

17   and searched who was barred in Georgia.  I found Ms. Renza, so

18   made the logical conclusion that this must be who they meant.

19   Contacted her and passed it to her, you know, which, to the

20   extent that that stepped, you know, beyond the bounds of what I

21   should have been doing, you know, I would ask that the Court

22   note that it was only done because the statute was in such close

23   proximity and may have been blown, but for.

24        THE COURT:  And you only had continuing access to the

25   Clio system because you had moved into an independent contractor

69

1   position to work on a few cases?

2          MR. ADAMS:  Yes, Your Honor.

3          THE COURT:  Okay.  Had you ever had any dealings with

4   Ms. Renza before this event?

5          MR. ADAMS:  No, Your Honor.

6          THE COURT:  How did you communicate with her on or about

7   December 10th?

8          MR. ADAMS:  I have to imagine that I sent her an email,

9   because I would not have had her cell number.

10         THE COURT:  And what do you remember about the

11  communications you and she had after you reached out to her?

12         MR. ADAMS:  I remember telling her that we had a dire

13  statute of limitations that was closing in and asked if she

14  would be willing to file as local counsel.

15         I believe she and I then spoke by phone, and I expressed

16  that I was not sure if she, in fact, was the local counsel that

17  the firm had intended or if they were still looking for outside

18  counsel, but nonetheless, asked if she would step in and help.

19         THE COURT:  If you answered this already, I apologize.

20  I just didn't catch it in my notes.  About when do you believe

21  you took a copy of the draft complaint and put it into the Clio

22  system, along with some note to personnel of the Lento Law

23  Group, P.C., that, essentially, this complaint is still

24  outstanding; it needs to be filed; I'm leaving the firm?  Can

25  you tell me when you actually uploaded that and put somebody on

70

1    notice as to that?

2         MR. ADAMS:  I can give you a approximation, Your Honor.

3    So I know in my resignation that I would make sure that all

4    matters were up to date in Clio by the end of that day.  That

5    was Tuesday, November 12th.  So it was sometime -- I believe it

6    to be sometime between November 1st and November 12th.

7         THE COURT:  So to be clear, you believe that you had

8    informed your employer with at least 30 days remaining, or about

9    30 days remaining on the statute of limitations, that this

10   complaint had not been filed, that you put a draft of it in the

11   system, and you flagged it for your employer to take some action

12   with it.  Is that correct?

13        MR. ADAMS:  And I made specific --

14        THE COURT:  Hold on.  Answer that question first.  Is

15   that all correct?

16        MR. ADAMS:  Yes, Your Honor.

17        THE COURT:  Please give me -- tell me what else you want

18   to say.

19        MR. ADAMS:  I'm sorry, Your Honor.  And I made specific,

20   specific note that it was before this court and would require

21   counsel for this court.

22        THE COURT:  Did you hear anything from anyone about

23   Dr. Gosse's complaint or know anything about its status until

24   you decided to go check for yourself on or about December the

25   10th?

71

1          MR. ADAMS:  Not to my recollection.

2          THE COURT:  Bear with me a moment, if you would.

3          Mr. Adams, you've indicated to the Court that you

4   affirmatively made clear to Dr. Gosse that you were not admitted

5   to practice in this court; correct?

6          MR. ADAMS:  Yes, Your Honor.

7          THE COURT:  Did you circulate a draft complaint to her

8   at any point that had your signature block on the complaint in

9   appearing to be the filing attorney?

10          MR. ADAMS:  I did, Your Honor.  That was unintentional,

11   as I note in my written response.  I use a standard -- standard

12   federal template, you know, just so I don't miss something like

13   a jurisdictional statement or something like that.  When I did

14   so, I left my signature on by accident.  I meant to strike it

15   out.  Slipped my mind.

16          I have since changed the way that I practice for that

17   reason.  Now, my template does not have a signature block

18   whatsoever, and my paralegals know that until there is a

19   signature block, it's not file ready.  So I have kind of removed

20   the possibility of things like that going wrong.

21          THE COURT:  By the time December 10th rolled around, are

22   you of the view that any -- well, strike that.  Let me ask this

23   question first.  Can you and I agree that you and Dr. Gosse had

24   established an attorney-client relationship at some point in the

25   course of your representation of her?

1       MR. ADAMS:  Yes, Your Honor.  Anything that she would

2   have told me was bound by privilege at that point and all the

3   things that go with that.

4       THE COURT:  Are you of the view that that attorney-

5   client relationship with Dr. Gosse ended with the termination of

6   your employment on or about November the 27th of 2024?

7       MR. ADAMS:  In an ideal world, it would have, because

8   the case would have been promptly transferred.

9       THE COURT:  I guess what I mean by it, in your view, it

10  was the firm's case, not your case at the time you chose to

11  leave your employment.  Is that correct?

12      MR. ADAMS:  Yes and no, Your Honor.  You know, I felt

13  that the firm had the responsibility for reassignment, but that

14  is why I kept my eye on it until the 10th, because I did not

15  feel that I was fully relieved of what I owed a client until

16  somebody else stepped in.

17      THE COURT:  Okay.  This question is not intended to

18  suggest you should have done this.  I just want to ask.  Did you

19  ever inform Dr. Gosse that Melissa Renza was going to become

20  involved in the case and be filing the complaint on her behalf?

21      MR. ADAMS:  Partially, Your Honor.  I made assumptions

22  that, in hindsight, I should not have.  So I informed her that

23  Georgia counsel had filed it, and that was the first phrase that

24  I used, Georgia counsel.  In hindsight, what I wish I had done

25  is put them both on an email and introduced them to one another.

1      You know, I had expected that Ms. Renza would do that

2  herself, but in looking at her written submission, when the case

3  was not tasked to her in Clio, she understandably lost track of

4  it.  You know, so that's -- I, in hindsight, regret that I had

5  not done that.

6      THE COURT:  But to be clear, the independent contractor

7  status that you established with the Lento Law Group, P.C.,

8  which I guess started sometime after your last day as an

9  employee --

10     MR. ADAMS:  Yes, Your Honor.

11     THE COURT:  -- on November 27, that independent

12  contractor status only pertained to a limited subset of cases

13  that you were agreeing to work on, and I presume Dr. Gosse's

14  case was not one of those; is that correct?

15     MR. ADAMS:  No, Your Honor.

16     THE COURT:  Is what I said correct?

17     MR. ADAMS:  Yes, Your Honor.  I'm sorry.

18     THE COURT:  Dr. Gosse's case was not part of the subset

19  of independent contractor cases you were agreeing to work on?

20     MR. ADAMS:  Correct.  I -- just from a logical

21  standpoint, I would not have taken that one because it would

22  have involved substantial travel down here, and with working for

23  another firm as a contractor, too, I just would not have been

24  able to juggle both.  So the cases that I kept were local.

25     THE COURT:  Okay.  Mr. Adams, have you ever been the

74

 1    subject of any disciplinary proceedings in any of the

 2    jurisdictions or courts into which you are admitted?

 3            MR. ADAMS:  No, Your Honor.

 4            THE COURT:  Mr. Adams, you've answered all of the

 5    questions that I had prepared for today, but as I said at the

 6    outset, I would afford you an opportunity to make any additional

 7    statement or argument that you may wish to present to the Court

 8    for its consideration on the question of whether the Court

 9    should or should not recommend contempt proceedings with respect

10    to your involvement in this case, and I'll be happy to hear from

11    you.

12            MR. ADAMS:  Sure, Your Honor.  And I will be brief.

13    Before I begin, does Your Honor want to see copies of the CLE

14    certificate or my resignation?

15            THE COURT:  No, sir.  I'll take your word for both of

16    those things.

17            MR. ADAMS:  Well, thank you.

18            Yes, Your Honor.  So I just want to clarify, you know,

19    we largely delved into the role that I played in this, you know,

20    and I just want to clarify, you know, that I did not hold myself

21    out as counsel of record.  I did not file with the Court.  I did

22    not sign on to the pleading that was filed with the Court.

23            You know, I had no intent to bypass, disregard, or

24    circumvent the rules of this court by any means.  I had fully

25    intended to *pro hac* once the docket was opened, you know, but

1    like we said, there's no way to prior.

2            And the only reason I did not *pro hac* after the fact is

3    because I stopped working for the firm.  You know, that said,

4    I'm not going to stand here and tell the Court that I handled

5    this matter perfectly.

6            Upon reading the Court's concerns, I recognize that

7    there were places where I could improve, and that's why I did a

8    deep self-study into multi-jurisdictional practice, including

9    Rule 5.  I took a CLE by -- his name's escaping me, but he's a

10   lawyer who holds himself out as the leading expert on the ethics

11   of multi-jurisdictional practice.  And that's why I chose his

12   course.  I also picked his course because he is barred here in

13   Georgia.

14           I would ask the Court to take note, too, that when I

15   left the firm, I made a specific note that this case needed to

16   be transferred and when the statute of limitations would run on

17   that.

18           And I think my final note for the Court, Your Honor,

19   would be that when I took on this case, I genuinely believed

20   that the firm had local counsel that would be reviewing

21   everything I wrote prior to submission.

22           And looking back, you know, one other thing I wish I did

23   differently is that just at some point I had pulled the docket

24   for this court and seen that there were problems, because my

25   hope would be that, you know, I could have phoned the Court,

1   tried to *pro hac* and have the Court, you know, appoint a local

2   sponsor or something like that where I could have tried to help.

3          You know, that's something I've done for other past

4   clients that have called before.  You know, I -- it's never my

5   intent that just because I leave the firm, that the client is

6   left out to dry.

7          And I believe that I acted in good faith and with

8   reasonable reliance as a first-year lawyer on the instructions

9   of my superiors.

10         Sorry, Your Honor.  I had written this as an opening, so

11  I'm trying to kind of just --

12         THE COURT:  Take your time.  We are in no rush.

13         MR. ADAMS:  Thank you.  Just trying to piecemeal through

14  it.

15         And I would just leave the Court with, if the Court does

16  conclude that I made an error, that I take full responsibility

17  and humbly apologize not just to this Court, but the client.

18         THE COURT:  All right.

19         MR. ADAMS:  Thank you.

20         THE COURT:  Thank you.  Appreciate it, Mr. Adams.

21         All right, Gentlemen.  You can retake your seat.  That

22  concludes the Court's hearing today.  I will note, though, just

23  for completeness, Mr. Harris, who represents Dr. Gosse, is

24  present in the courtroom.  I would think that Dr. Gosse really

25  has no standing with respect to the particular issue before the

77

1    Court.

2         But, Mr. Harris, I just wanted to confirm that you did

3    not see a need to be heard in any respect today?

4         MR. HARRIS:  Thank you, Your Honor.  I do not believe

5    that I do have standing.

6         THE COURT:  All right.  Very well.  This court stands in

7    recess.

8              (Proceedings concluded at 2:37 p.m.)

9                        - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

78

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3           I, Kelly A. McKee, Registered Diplomate Reporter,

4   Register Merit Reporter and Certified Realtime Reporter, in and

5   for the United States District Court for the Southern District

6   of Georgia, do hereby certify that pursuant to Section 753,

7   Title 28, United States Code, that the foregoing is a true and

8   correct transcript of the electronically recorded proceedings

9   held in the above-entitled matter and that the transcript

10  subsequently transcribed by me is true and accurate to the best

11  of my ability to hear and understand the recording, and the

12  page format is in conformance with the regulations of the

13  Judicial Conference of the United States.

14

15          Dated this 27th day of September, 2025.

16

17

18  _____
       *Kelly A. McKee*

19  KELLY A. McKEE, CCR, RMR, RDR, CCP

20

21

22

23

24

25